Good morning. Good morning. May it please the Court, Stanley Feldman for the appellants. There's an interesting footnote in Judge Broomfield's order about the 60 pounds of paper and the resultant effect on the forests in the state of Arizona that came about because of this case. Rereading the record and his order, it strikes me that this case is not nearly as complex as perhaps all of counsel on both sides have made it. What we deal with here is a very precise and small niche in Arizona law, simply what is the duty and responsibility of an insurance company in a case in which it has not received a settlement offer from the victim's lawyer and a case in which the policy limits are known to be minimal, a case in which the injuries are known to be catastrophic, and a case in which the insurer's liability is set and is known to exist right at the beginning. Judge Broomfield, in his order in pages 39 to 40, made it quite clear that Safeway was on notice about all of these things and it was on notice about them as early as December of 1994. You know, the difficulty I'm having with this case is what is the Arizona law. But Judge Broomfield, all the way through this 75 pages of opinion, talks pretty closely language of Clearwater. Until he gets to the place where he cites Meele, and then that's page 50. And I'm just not sure what the Arizona law is. The Arizona court took Meele up to decide it, and then it was settled. And the attorney association from Arizona tried to get them to depublish Meele. That was denied. So the Supreme Court has shown something towards Meele. But Meele seems to be a different standard from Clearwater. And Judge Broomfield appears to be using each. Can you tell me where ñ can you put together Clearwater and Meele for me? Only in this way, Judge Wallace. Meele was a case in which the real issue, and in fact the only issue decided, was the question of whether or not you needed something more than negligence. And heaven knows just what more you need under Arizona law than negligence. But the issue in Meele was whether or not you could recover for bad faith when the company had admitted, as they said in Meele, we admitted we were negligent but we didn't act in bad faith. And Meele was a case simply that held that you've got to instruct the jury that something more than mere mistake or inadvertence was required. As in intent. Pardon? Intent. Yes, intent. See, that's different from Clearwater. Well, Clearwater and the Arizona revised Arizona jury instructions based on Clearwater and that are in use today talk about intent, but it's not the kind of intent that ñ intent to harm the insured. It's intent ñ in other words, it's a knowing act. And there's no problem about there being a knowing act in this case. Safeway didn't misfile some papers. It didn't misaddress an envelope. It didn't lose its file. It didn't do anything is the problem. And it knew it wasn't doing anything. It simply delayed and didn't take action that it could have taken to fulfill its duties. Well, if the ñ he goes through this entire thing talking about the eight factors or whatever they are, and then he said, must amount to a finding that the insurer acted either with intent or reckless disregard so as to fail to provide the insured with the security and protection from the calamity, which is the object of the relationship. Now, it just strikes me that when you're talking about intent or with reckless disregard, there's something there other than what Clearwater says of giving equal interest or equal consideration. And I don't even understand from the opinion where it fits in, but we've got to review it. And, frankly, how these facts come out depends a lot on the law you apply. So help us out. Well, I wish I could help you out more than is possible to help you out. All I can tell you is that the one case that is precisely on this point is Clearwater. And Clearwater makes it very clear that there are two types of standards, one applicable to first-party cases and one applicable to third-party cases. The case before the bench here is a third-party case, and Clearwater, the revised jury instructions for whatever authority they may carry in this Court, and Fulton v. Woodford make it very clear that what the standard is in a third-party case is that the insurance carrier must act reasonably to protect its insured from an excess judgment. And you interpret Meehl, then, as a first-party claim. No, it is not. I can't interpret it because it's not. It's pretty clear from Meehl that it's a third-party claim. But it's some language just dropped into the opinion, citing, as a matter of fact, Trest-Joyst, which is another case, which just happens to drop it in the opinion. And these are opinions that are not on the issue. They are on issues other than the opinion or than the question which is before this bench, which is the duty in third-party cases. Okay. Now, if you're right on that, then what you're telling us is that in injecting Meehl into the case, that was wrongly injected. That is, we should have stayed with Clearwater analysis, period. Yes, sir. Clearwater and Fulton. If the district court now thinks Meehl is involved and, as you say, is wrongly injected in the case, then the district judge has used the wrong standard in reviewing the case. Don't we have to send it back for the district judge to relook it, write us another 75 pages, but leaving Meehl out? Well, I trust we won't get another 75 pages. But the answer to your question is yes. I think the standard has got to be articulated. And the standard is set forth, as I said, in Clearwater and in Fulton v. Woodford. And that's what makes this case so un-complex, if I may coin a word, is simply Fulton v. Woodward says that in a case where the insurer knows all these things, and the judge made an actual finding, Judge Broomfield did, that they were on notice from December 1994 that the requirement is that the insurance carrier act the case. Is it your position it doesn't have to go back? Is it your position we don't have to remand it for the judge to consider the case leaving Meehl out of his room? I think it could need to be remanded, because I think there are arguments to be made on both sides on quite a few issues. But I think that it is possible simply to remand it for trial. Is it your position we should remand it specifically for the purpose of having him reconsider under what we perceive to be the correct Arizona law? No, sir. My position is that it needs to be remanded for trial. I think the correct Arizona law is clear. If there's some ---- So you're not taking the position that the insertion of Meehl into it necessitates a remand for reconsideration of the law? That is correct. I'm not taking that position. You want us just to give a straight reversal that the judge missed the point? Yes, sir. Okay. I understand your point. Thank you. If there's some real question about Arizona law, given the confusing language in some of the cases, it's always possible to certify that question to the Arizona Supreme Court, if that's what this Court would wish to do. No, I'm asking a more specific question. Okay. As counsel for one of the parties, what you'd like to have us do. And if I understand your position is that you're not taking a position that we need to remand this case for reconsideration under some different standard of Arizona law, that what the district judge did here is sufficient. That's correct. That's correct, yes. Let me mention two other things. If it is remanded in accordance with our position, I do think that we need to take into consideration the trial judge's ruling on expert testimony. Judge Broomfield quite clearly rejected consideration of the testimony of both experts that were presented by the plaintiff, or by the defendants in this case, by the victims. And he did so saying that he knew as much law as they did, which is unquestionably true. But there are innumerable cases, among some cases from the Ninth Circuit, which we've cited in our brief, primarily Handgartner, which make it quite clear that we know what conforms to usual and proper industry standards in the handling of claims, especially in the handling of claims where there is a great danger of an excess verdict. Now, there are, in the depositions of these experts, expressions of opinion as to what the law in Arizona is. Quite a bit of those expressions are based upon the fact that they were asked questions by the person taking the deposition about what they understood about Arizona law. But there are also very clear statements as to their view about what an insurance carrier in this factual situation ought to do in conformance with industry practice to avoid subjecting the insured, in this case, to a $12 million judgment. And that judgment, the reasonableness judgment, has now been affirmed by the mandate as issued. So that's final, that's part of the case. In reaching this preclusion, so to speak, decision to preclude that testimony in his consideration of the case, the trial judge, I think, and I submit went beyond the proper boundaries of consideration at this summary judgment standard. It is true that the finder of fact, whether trial judge or jury at trial, could disregard expert testimony completely. But it is also true that I believe, and I submit that at summary judgment stage, the only question before the trial judge is whether or not the witnesses are qualified, whether the rule 702. These witnesses were insurance defense counsel, both of whom expressed woods and seams was their name, both of whom expressed opinions that the insurance carrier here had simply done nothing to comply with the requirements to initiate settlement discussions and to attempt to settle the case. And I think the facts are quite clear that support that. From November of 1994 till October of 1995, when the first settlement demand was made under Fulton v. Woodward, in that 11 months, the insurance carrier knew everything it needed to know, the judge found that, and yet it did nothing but send two letters saying, first, we're investigating, and second, we're waiting for medical bills. And both of these witnesses say that that amounts to nothing, nothing in the way of settling the case. Now, they didn't come in with a tender. They didn't write a letter saying we offer to settle for the $15,000 limits. They didn't do anything. But there are other people involved. There's 15 and 30. The insurance company isn't in a position till he knows all the facts of how to carve that up. When they did know, then the plaintiffs didn't want them to settle. At the very beginning, the plaintiff's lawyer says, don't settle this case. Then they had to wait for the government to take care of the land. And then finally to get approval. It strikes me that it's a little difficult for the insurance company to be tarred with all the fault of delay when the plaintiff isn't in a position to make an actual settlement. Well, but the obligation of the insurance company is not to the plaintiff. It is to the insurer. Okay. And Fulton v. Woodward requires them to initiate settlement talks and to attempt to settle the case. And they never did that until 11 months passed from the date of the ---- They talked to each other. That's ---- They did talk to each other. They did talk to each other. Now, on the ---- ---- that at some point in time they're required to offer the policy limit. That was the testimony with regard to industry practice. And I think I can say without equivocation, yes, in this situation, in this situation, yes. Even when the plaintiff says don't settle the case. Well, that's not ---- The plaintiff's lawyer says it's off the table, no settlement. Everybody knew what that meant. What the plaintiff's lawyer meant and what the insurance company understood that the plaintiff's lawyer meant is don't use up any part of the first $15,000 on the other five claims for the people who weren't hurt badly. That's not what it said. That's not what the letter said, but that's what the testimony, that's what the testimony of both Mr. Guerrero, who wrote the letter or whose assistant wrote the letter, and of the recipient of the letter, Mr. Cecil, that was what was understood. And that, of course, is all that makes sense. The lawyer ---- The testimony of the recipient that says he understood it to mean not to settle with the other people. Where is that in the record? That's in the record. It's in Mr. Cecil's deposition. But can you point me specifically to the ---- Not at this moment, but it was quite clear that that's what was said. And later on what was said, you could interplead the funds. And they didn't do that either. And they were aware from the very beginning. Your Honor, the demand actually occurs on October 23. Ninety-five. Of 95. But it's a conditional demand. It is. They want to look at the policy and they want a statement from HOTMA. So it's not a straight demand. It's a conditional demand. It's a conditional demand. And then just four days later, Safeway says they're trying to do a global settlement. December 18, Safeway proposes 15,000 Heinz, remaining 15 divided for the other claimants. Right. So they've now complied. But then the plaintiff says, wait a minute, I can't accept that until I get a waiver and I get approval.  Now, it strikes me that that's a pretty fair response. What is there in the record to show that they should have done something different under these circumstances? At that point? At that point, nothing. But now we are now, what, 16 months post-chance to settle this case. And what they did is they ran the risk, and I'm using up time I'd like to save for rebuttal, but they ran the risk of just something happening just like what happened eventually of the plaintiff finally finding a product liability action and being afraid to settle with the adverse driver because of Arizona's empty chair problems in a comparative fault state. Okay. Thank you. Thank you, counsel. Thank you, counsel. May it please the Court. My name is Joel Nomkin. I am counsel for the Apple Lee Safely Insurance Company. There is a great deal of Arizona law on the subject of bad faith. Cases involving insurance companies that refuse to defend, refuse to identify, refuse to settle. This case isn't like any of those cases. In this case, the appellant, the claimant, is asking this Court to do what no court applying in Arizona law has ever done, which is to hold that an insurance company may be liable for bad faith failure to settle in circumstances where the insurance company actually put a concrete proposal to settle for policy limits on the table long before a complaint was ever filed against its insured. What point was the policy put on the table? What's the date? Your Honor, December 27th. Sorry? December 27th. I'm sorry. December 18th, 1995, which is. Counsel, is it your position that the filing of the complaint triggers the obligation to settle? Your Honor, the Fulton case sets forth circumstances in which an insurance company may have an obligation to initiate settlement. Well, I was focusing on your statement that it was put on the table long before the complaint was filed as if that's the criterion for determining whether or not it's reasonable. So I'm asking you what case authority, if any, are you relying upon to support your implication that the complaint corrals the reasonable time period? Yes, Your Honor. The significance of that is that there was nothing to alert Safeway that its insured's interests were ever in jeopardy, not until after the claimant pulled the plug on settlement in June of 1996. And if you take the argument really is that ten months went by from the time of the the policy was put on the table, and that during that period of time, the insurance company was well aware that Castano was in a coma and had medicals in excess of 300,000. So there's no question at all the company knew that in case of liability, that first 15 is gone. And indeed, there was no question in anybody's mind that there was liability. So you had a liability case with 300,000 in medicals and a $15,000 limit. And at that time, the insurance company has to know the 15's gone, and all they're trying to do is effectuate something so that their insured doesn't get into difficulty. And what they're arguing is, I understand it, that it should have occurred earlier that the policy was put on the table under those circumstances, certainly back in February when the insurance company knew the extent of the loss. What's your response to that? My response first starts, Your Honor, with what the law is in Arizona on the requirements for bad faith. There are two elements. The first element is that the insurer, the insurance company, act unreasonably towards its insured. You're letting your voice drop, and I'm missing part of your argument. I'm sorry. There are two elements to bad faith. The first is that the insurance company act unreasonably towards its insured. And the second is that the insurance company knows that its conduct was unreasonable or act with reckless disregard. Your Honor asked questions about that standard, focusing on the Clearwater case. Well, even after Clearwater, we had Meehl, and even after Meehl, we had the Twin City case. As a court of appeals, Clearwater is Supreme Court. We need to give a little more deference. It's an old case. I understand that. Yes, Your Honor. And the Twin City decision, which we cited in our Rule 28J letter, is also a Supreme Court case decided in 2003, which I quote said, to prove a bad faith claim based on the failure to settle, a plaintiff must demonstrate that the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable. And I think I could even ---- Was that a third-party case? It was. The case arose out of a third-party claim brought by an excess insurance company against the primary insurance company that had refused to settle a claim brought against the insured. The worst kind of lawsuit. The worst kind of lawsuit, Your Honor. It arose in an unusual context. It had to do with questions about whether the attorney-client privilege had been waived. And the Court said, well, it hadn't been waived with respect to communications received by the excess carrier and its attorneys. But it contrasted that situation with when a primary insurance carrier is involved. In that situation, the Court said communications between the primary's counsel and its lawyer may be waived, and in fact, the Supreme Court precedent had been waived, because of the intent element of bad faith. And so if the primary insurance carrier's intent is at issue, as it is under the meal test, the relevance of attorney-client communication allows for those kinds of communications to be ordered to be produced. If I take it from what you're telling me, that if I look at Clearwater, I'm not getting enough to know what the Arizona law is today, that there have been modifications in the approach by subsequent cases? I don't even think it's modification, Your Honor. If you take a look at Clearwater, Clearwater is actually a very narrow decision. What Clearwater did is it vacated that portion of the court of appeals decision that said that in a third-party case involving failure to settle, the jury should be instructed on fair debatability. In a first-party case, when a claim is fairly debatable, that is a defense for the insurer not to cover the claim. In a third-party case, the court in Clearwater says, well, fair debatability may be a factor to consider, but it's not a get-out-of-jail-free card for an insurance company. There may be circumstances, even where the claim is fairly debatable, where the insurer is giving due consideration to the interests of the insured and given the amount of the  Equal consideration. That's right. In that situation, when the insurance company is considering whether to accept or reject a settlement offer, it is required to give equal consideration. And the court said you don't give the jury in that context a fair debatability instruction. But that's all it held. It didn't reverse other aspects of the court of appeals decision in that case. And if you look at the court of appeals decision in the case, the court of appeals noted that the tort of bad faith is quasi-intentional and requires proof not only that the insurer acted unreasonably towards its insured, but also acted knowing that it was acting unreasonably or acted with such reckless disregard that such knowledge may be imputed  That's Neal. Would you apply that ruling to a circumstance where there's a catastrophic injury to the victim and the insurance company is aware that the damages are likely to exceed the policy limits? How do you apply that? Well, let me apply that standard to the facts that we have here. What we know is that on November 14th, 1994, the claimant's lawyer, Mr. Guerrero, sent his first letter to Safeway saying I represent the claimant and here's what I want you to do. You should not settle any claims arising from this accident, any claims. And I'm not aware of any testimony by anyone from Safeway that interpreted that language to mean other than what it said. In fact, the letter went on to say that rather than settle any claims, what Safeway should do is interplead its insurance policy limits. Well, that ---- So you take issue with opposing counsel's representation that a representative from Safeway interpreted that as being don't settle any other claims? I do, Your Honor. I do take issue with that representation of the record. And from Safeway's point of view, to do what the insured was asked, the claimant was asking in November ---- on November 14th to interplead its insurance policy limits. That would have been the worst of all worlds for the insured. It would have gotten Safeway off the hook, but it would have kept the insured exposed to all the other claimants in the case for the full amount of their damages. So what did Safeway do? Safeway wrote back in December and asked for copies of the injured woman's records, which was a similar request to the other claimants in the case. This was a case involving four cars. There were over a dozen people involved in the accident, including five people who went to the hospital. Well, in February, Guerrero's law firm, that's the claimant's lawyer's law firm, wrote back to Safeway, said they were trying to gather the medical bills, and would get back to Safeway again soon. We will be in contact with you again soon are its exact words. In other words, Guerrero is clearly announcing at that point that the settlement ball is now in his court. And that's where things stood until October 23, 1995, when Guerrero finally sent the bills he had agreed to provide. And with those bills, he said, in his words, the time is right to present our demand for settlement. And then he went along and provided his settlement offer. So that's the entire chronology. Where is the bad faith by Safeway on these facts? Now, the appellant argues that Safeway acted unreasonably in waiting for the claimant's lawyer to provide the medical bills that the lawyer undertook to provide. But that's not bad faith. On the issue of, even on the first issue, the question of was Safeway's conduct unreasonable, the question is, did Safeway have reason to know that by waiting for the claimant's lawyer to provide the bills that he had agreed to provide, he was putting his insurance interests in jeopardy? That's the very question that the Arizona Court of Appeals posed in the Peyton case, which we cite in our brief, and I'd like to refer you to the court, especially to the last page of that decision. There, the Peyton, P-E-A-T-O-N. The Arizona Court of Appeals there directed entry of summary judgment for an insurer because there was nothing to show that the, to tell the insurance company that its insurance interests were in jeopardy and that the claimants were about to pull the plug on settlement over one of the negotiation issues, an issue concerning interest in that case. Well, precisely the same is true here. Before October 1995, when Himes finally supplied the medical bills, there was nothing to alert Safeway that its insurance interests were in jeopardy by waiting. And, in fact, they weren't in jeopardy. We know that on October 23rd, the claimant actually said, here's an offer to settle the case. The time is now right for settlement. And she didn't sue until eight months later. So on those facts, Your Honor, I would submit there's no evidence of unreasonable conduct, let alone the kind of knowing conduct that Arizona law requires. The Fulton case doesn't change this analysis at all. Fulton does recognize that in certain circumstances, an insurer may have a duty to initiate settlement because its insurer is facing a strong policy-busting case. But there is no case saying that Fulton's duty to initiate settlement is breached when either the claimant or the insurance company actually offers to settle the case before litigation is filed. And in our situation, both the claimant, Himes, and Safeway put settlement offers for policy limits on the table. The claimant did it on October 23, and Safeway did it on December 18th. So Safeway's policy limits offer demonstrates that rather than gambling with its insurer's interests, which was what Fulton was concerned about, it was expressly trying to avoid exposing its insured to the risks of litigation. Fulton was the case that both sides wanted partial summary judgment through an interpretation. And Fulton has a situation in the absence of demand. But I read Fulton as saying just when the duty of equal consideration arises. That's right, Your Honor. That's the issue. And whenever it arises, your argument is wherever it arises, we were giving equal consideration. Absolutely. I mean, there's no question. Really, the equal consideration issue arises once you've got a settlement offer on the table. That's the traditional situation. Yeah. It can be earlier. There can be duties that the insurance company owes before the claimant puts a settlement offer on the table under Fulton, Your Honor, yes. But what we would submit is we satisfied all of our duties before then because we didn't act unreasonably or knowingly so before then. I think now you're moving into Meehl, but even under Clearwater, as I understand your argument, you were giving equal consideration, which is the issue of Fulton. When does the equal consideration issue come up when there's an absence of a demand? That's correct, Your Honor. And your argument, as I understand it, is whenever it came up, we were doing it. Absolutely right. So that's why you feel that Fulton doesn't hurt you. I think Fulton supports us and does not hurt us. And I think the presence of Safeway's good faith is only confirmed by what happened after the October 23 offer letter that Himes sent. Just four days later, Safeway wrote back to Himes saying, okay, great, we're going to put a package settlement offer together that will resolve all the claims against our insured. And soon after, on December 18, Safeway follows up with a concrete offer to do just that, settle all the claims against the insured, including an offer of policy limits to Himes. And in fact, after getting that letter, two of the other claimants accepted it, accepted a settlement. Himes, on the other hand, initially responded to Safeway saying, well, wait a minute, I think we want to assert a claim for loss of consortium. She then changes her mind and says, her lawyer says go ahead and proceed with settlement. Then comes February of 1996, and this period is critical. In February, at Safeway's request, Himes' lawyer prepares a release. And the release says that Himes will release all claims against Safeway in exchange for the sole consideration of $15,000. With that release, there's a cover letter. And the cover letter says to Safeway, look over this release. If it's acceptable to us, get back to us. And we will have, if it's acceptable to you, we will have Himes sign the release. The same day that Safeway gets that release, it's undisputed, Safeway informs Himes, Himes' lawyer, that the release is perfectly acceptable. But now, wait a minute. You said the release released Safeway, but it's supposed to release the insured. And it does. The release applies to both Safeway and the insured. I'd like to move quickly to a couple other issues in the case. On the attorney's fee issue, there are three things to emphasize at the very outset. One is the insured's, the expert testimony cannot fill the void of causation in this case. Causation is an independent ground that requires judgment for Safeway. Why is that so? Himes admits that she couldn't settle this case until she got a waiver of the government's medical lien. The government had a medical lien as a lien on the settlement proceeds. The government had a medical lien because the injured party, Castano, was receiving military medical benefits. It's undisputed that Himes didn't apply for those benefits until December of 1995. She didn't get a waiver of those benefits until June of 1994. And until then, I'm sorry, 96, Your Honor. Until then, had Safeway written the settlement check, it would have gone to the Federal government and not to Himes. And Himes concedes that in the two weeks or so that followed between the time she got the waiver and the time that she pulled the plug on settlement, there wasn't anything that Safeway did that caused the plug to be pulled on settlement. In fact, in their summary judgment papers, what Himes concedes is that the reason they pulled the plug on settlement was they didn't want to face an empty chair defense in the lawsuit against General Motors, which is the manufacturer of the vehicle in which the injured party was injured. And the lawyers also stated that they didn't want to get BATMA out of the picture, the insured out of the picture, because it might create diversity jurisdiction in the suit that it was going to, the product of expert testimony. The experts also can't fill the void of the subjective element of bad faith. And third is the very narrow limits of the expert, Judge Broomfield's ruling on expert testimony. He did not rule that expert testimony would be inadmissible at trial. What he did hold was that the specific expert opinions that were presented to him were, in the summary judgment papers, were not evidence. They were merely legal conclusions. The judge's finding on that regard is unassailable. The reports are pure advocacy. They are simply third-hand recitations of the fact, followed by the expert's conclusions of law. They are essentially another set of lawyers wearing expert hats, putting a blessing on the arguments of the litigants. And that doesn't create evidence. MS. GOTTLIEB All right. Counsel, your time has expired. Thank you very much. Rebuttal? MR. GOTTLIEB Court, please. I apologize for not remembering offhand the citation to the record on your question as to what the do-not-settle letter meant. It's covered on page 2 and 3 of our reply brief. And as to what Mr. Guerrero meant and what Safeway was aware of and understood, it is set forth at tab 1.30 at 00568. It is also the only thing that it could mean, because there's no sense at all in telling an insurer which has a $15,000 limit not to offer the $15,000 limit, because once they offer it, they're off the hook. The insured is off the hook as much as the insured could be. Let me go back to Clearwater. Clearwater is the one Arizona case which is right on this point in which the Court had to consider the difference between first-party and third-party claims. We've set it out in our brief. It's summarized in the revised Arizona jury instructions. There is a difference between the two standards. The standard applicable to this case as set forth in Clearwater and in Fulton is simply this, that the insurance carrier must act reasonably in order to protect its insured. And the question before the fact finder is always whether the insurance carrier, given the facts of a particular case, did act reasonably. In this case, a lot of what Mr. Nopkin says could well be argued, but a lot of what we say could well be argued. The point of it is simply this, that from the date of the accident, in November of this year, the insurance carrier, in October of 1994, and starting with Mr. Guerrero's letter, in October 1994, the company did not do anything to make an offer of settlement for $15,000, even though they knew everything, as Judge Broomfield found, everything they needed to know to trigger, so to speak, the Fulton requirement. Counsel, you cited us to page 568 of the record. That's the expert's declaration, but your representation was that there was some deposition testimony from a representative of Safeway that you were relying on. I believe, and I cannot cite that to you, but I believe that that was in one of the depositions. There are 60 pounds of paper here. But anyhow, it's all it could mean. It's all it could mean. We get to the experts. The experts are quite clear as to what the duty of the insurance carrier was here. And finally, I'd like to end up with one thing as to this offer of settlement in December of 1995, which is a year and several months later. As the Arizona Court of Appeals summarized it, and I can't put it in better words than this, Mr. Ciesla, when he wrote that letter, did not have authority. He did not make a $15,000 offer, even then, a year and five, six months after the accident. What he said is, we propose the following. This company never wants, in all of its history, to make an offer of settlement. All the time, even up to the year it took to get the offer of settlement from Mr. Guerrero, to the time at which they responded in December of 1995, never once made an actual offer, quote, we will pay $15,000. Counsel, we understand your argument. Thank you very much. The case, as argued, is submitted for decision by the court. Final case on calendar for argument.
judges: Wallace, Rawlinson, Bybee